**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **BUSPATROL AMERICA, LLC** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:18-cv-0991-D** |
| | § | |
| **AMERICAN TRAFFIC SOLUTIONS, INC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER**

Plaintiff BusPatrol America, LLC ("BusPatrol") files this Brief in Support of Plaintiff's Response to Defendant's Motion to Dissolve Temporary Restraining Order. Defendant American Traffic Solutions, Inc.'s motion is filed as Dkt. No. 3 and BusPatrol's response is filed as Dkt. No. 11. BusPatrol respectfully requests the Court deny Defendant's motion for the reasons set forth herein.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: */s/ Robert L. Rickman*
    Robert L. Rickman
    Texas Bar No. 24013400
    rrickman@krcl.com
    Thanksgiving Tower
    1601 Elm Street, Suite 3700
    Dallas, Texas 75201
    Telephone: 214-777-4281
    Facsimile: 214-777-4299

    -and-

Bruce C. Morris
KANE RUSSELL COLEMAN LOGAN PC
State Bar No. 14469850
bmorris@krcl.com
5051 Westheimer Rd., Suite 1000
Houston, Texas 77056
Telephone: (713) 425-7450
Facsimile: (713) 425-7700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiff's Response, Brief, and Appendix were served on all counsel of record by CM/ECF filing on this 23rd day of April, 2018, with the exception of those documents sought to be filed under seal, which were served by e-mail to all counsel of record by agreement.

*/s/ Robert L. Rickman*
Robert L. Rickman

## TABLE OF CONTENTS

Table of Contents ......................................................................................................... i

Table of Authorities ..................................................................................................... ii

I.      Introduction .......................................................................................................... 1

II.     Uncontroverted Facts ........................................................................................... 2

        A.      BusPatrol's Trade Secrets and their value to BusPatrol's Safety Program. .......... 2

        B.      BusPatrol owns the BusStop Technology containing its Trade Secrets. ................ 4

        C.      Reasonable steps have been taken to keep its Trade Secrets confidential. ............. 5

        D.      BusPatrol recently learned that Defendant held a secret meeting with a school
                district, improperly gained access to BusPatrol's proprietary BusGuard kits and
                had them shipped to its facilities for reverse engineering ...................................... 7

        E.      As recently as April 9, 2018, Defendant improperly attempted to convince the
                manufacturer of BusPatrol's proprietary BusGuard kits to disclose BusPatrol's
                Trade Secrets ................................................................................................ 10

        F.      BusPatrol's Application for TRO was properly granted ........................................ 10

III.    Argument and Authorities .................................................................................. 11

        A.      Basic Legal Standards ......................................................................................... 11

        B.      ATS conflates the standards for pleading and the issuance of a TRO ................. 11

                1.      The pleadings requirements of Rule 8 are irrelevant to a TRO. ............... 11

                2.      BusPatrol has adequately pleaded its trade secrets. ................................. 15

        C.      BusPatrol satisfied the four elements required for a preliminary injunction. ....... 17

                1.      Likelihood of Success on the Merits ....................................................... 17

                        a.      BusPatrol Owns Trade Secrets in the BusStop Technology ......... 17

                        b.      ATS Obtained BusPatrol's Trade Secrets through

                                Improper Means. .......................................................................... 19

                2.      Irreparable Harm. .................................................................................... 21

                3.      Threatened Harm Outweighs Any Damage Injunctive Relief Might Cause
                        ATS…............................................................................................... 22

                4.      The TRO Will Not Disserve the Public Interest. ...................................... 23

        D.      The Court should not consider ATS Appendix Exhibit "D". ............................... 24

IV.     Conclusion ......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*A.M. Castle & Co. v. Byrne,*
    123 F. Supp. 3d 909, 915 (S.D. Tex. 2015) ............................................................ 19

*American Derringer Corp. v. Bond,*
    924 S.W.2d 773 (Tex. App.—Waco 1996, no writ) ................................................ 20

*Bluefield Water Ass'n, Inc. v. City of Starkville,*
    577 F.3d 250, 253 (5th Cir. 2009) ......................................................................... 11

*Byrum v. Landreth,*
    566 F.3d 442, 446 (5th Cir. 2009) ......................................................................... 17

*Cantor v. Wachovia Mortgage, FSB,*
    641 F. Supp. 2d 602 (N.D. Tex. 2009). .................................................................. 24

*Clark v. Prichard,*
    812 F.2d 991, 993 (5th Cir. 1987). ........................................................................ 11

*Clearline Techs. LTD v. Cooper B-Line, Inc.,*
    2012 WL 43,366 (S.D. Tex. Jan. 9, 2012) ....................................................... 13, 15

*Fetter v. Associated Rack Corp.,*
    607 S.W.2d 272 (Tex. Civ. App.—Texarkana 1980, writ ref d. n.r.e.) cert. denied,
    454 U.S. 965 (1981) .............................................................................................. 20

*First Command Fin. Planning, Inc. v. Velez,*
    No. 4:16-CV-01008-O, 2017 WL 2999405 (N.D. Tex. May 8, 2017) .................... 21

*Franciscan All., Inc. v. Burwell,*
    227 F. Supp. 3d 660, 684-85 (N.D. Tex. 2016) ..................................................... 17

*Granny Goose Foods, Inc. v. The Brotherhood of Teamsters and*
*Auto Truck Drivers, Local Number 70 of Alameda County,*
    415 U. S. 423 (1974) .............................................................................................. 14

*Halliburton Energy Services, Inc. v. Axis Techs., LLC,*
    444 S.W.3d 251 (Tex. App.—Dallas 2014, no pet.) .............................................. 23

*H.E. Butt Groc. Co. v. Moody's Qual. Meats,*
    951 S.W.2d 33 (Tex. App.—Corpus Christi 1997, writ denied) ............................ 18

*Hassani v. Napolitano,*
    No. 3:09-CV-1201-D, 2009 WL 2044596 (N.D. Tex. July 15, 2009)
    (Fitzwater, C.J.) .................................................................................................... 11

*Horner v. Am. Airlines, Inc.,*
    No. 3:17-CV-0665-D, 2017 WL 978100 (N.D. Tex. Mar. 13, 2017)
    (Fitzwater, J.) ....................................................................................................... 11

*Hughes v. Age Indus., Ltd.,*
    No. 04–16–00693–CV, 2017 WL 943423 (Tex. App.—San Antonio Mar. 8, 2017, no pet.) . 21

*Janvey v. Alguire,*
    647 F.3d 585, 596 (5th Cir. 2011) ......................................................................... 17

*K&G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,*
    314 S.W.2d 782 (Tex. 1958), *on reh'g sub nom. K & G Oil Tool & Serv. Co., Inc. v.*
    *G & G Fishing Tool Serv.*, No. A-6577, 1958 WL 91271 (Tex. June 4, 1958) ......... 22-23

*Lamont  v. Vaquillas Energy Lopeno, Ltd.,*
    421 S.W.3d 198 (Tex. App.—San Antonio 2013, no pet.) ..................................... 18

6156951 v3 (71278.00004.000)

*Medafor, Inc. v. Starch Med Inc.*,
    2009 WL 2163580 (D. Minn. July 16, 2009) ....................................................... 15
*Metallurgical Indus. Inc. v. Fourtek, Inc.*,
    790 F.2d 1195 (5th Cir. 1986). ......................................................................... 18, 23
*Opulent Life Church v. City of Holly Springs, Miss.*,
    697 F.3d 279, 297 (5th Cir. 2012). ......................................................................... 22
*Pension Advisory Group, LTD v. Country Life Insurance Company*,
    771 F. Supp. 2d 680 (S.D. Tex. 2011). .............................................................. 13, 15
*Picker Int'l, Inc. v. Blanton*,
    756 F.Supp. 971 (N.D. Tex. 1990). ......................................................................... 21
*StoneEagle Services, Inc. v. Valentine*,
    2013 WL 9554563 (N. D. Tex. June 5, 2013) ......................................................... 13
*Tendeka, Inc. v. Glover*,
    No. H-13-1764, 2015 WL 2212601 (S.D. Tex. May 11, 2015)................................. 20
*Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*,
    608 F.3d 200 (5th Cir. 2010). .................................................................................. 11
*T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*,
    965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism).................... 18
*Vesta Corp. v. Amdocs Management Ltd.*,
    80 F. Supp. 2d 1152, 1164 (D. Or. 2015). .............................................................. 16

**Statutes**
Tex. Civ. Prac. & Rem. Code § 134A.002. ...................................................17-18, 20-21
Tex. Civ. Prac. & Rem. Code § 134A.003. ...........................................................17-18, 21

**Rules**
Fed. R. Civ. P. 8.................................................................................................................. 12
Fed. R. Civ. P. 12(b). ........................................................................................................ 12
Fed. R. Civ. P. 15(a)(1)(b). ............................................................................................... 12
Fed. R. Civ. P. 65(b)(1)..................................................................................................... 12
Fed. R. Civ. P. 65(b)(1)(a). ............................................................................................... 12
Fed. R. Civ. P. 65(b)(4)................................................................................................. 13-14
Fed. R. Evid. 901(a)........................................................................................................... 24
Fed. R. Evid. 901(c)........................................................................................................... 24

**Other**
BLACK'S LAW DICTIONARY (10th ed. 2014) ("Prima Facie Case").............................. 17
IIA C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE, §2953 (2013). ................ 13-14
RESTATEMENT (SECOND) OF TORTS § 757, Comment (b) at 6 ..................................... 19
RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39, Comment (f)......................... 18

6156951 v3 (71278.00004.000)

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER</u>

### I.   <u>INTRODUCTION</u>

This case involves the intentional misappropriation of BusPatrol's confidential information and trade secrets by its main competitor, ATS, through a series of exchanges with the troubled Dallas County Schools ("DCS").  When DCS began contemplating the sale of its assets to try and get out from underneath its suffocating debt, ATS saw an opportunity and devised a scheme to do something it otherwise would not be able to do: get its hands on BusPatrol's BusStop Technology and Trade Secrets so that it could understand how it worked, replicate its features, and better compete with BusPatrol's superior product.  ATS proceeded to convince DCS to provide ATS with extraordinarily detailed trade secret information about how the BusStop Technology worked as well as sending ATS two complete units, thereby arming ATS with everything it needed to reverse engineer BusPatrol's industry-leading technology.

On April 13, 2018, after learning of clandestine meetings between DCS and ATS officials and the shipping of its products that contain its highly valuable confidential software and firmware, BusPatrol filed its Original Verified Petition in the 95th Judicial District Court of Dallas County, Texas, alleging violations of the Texas Uniform Trade Secrets Act and seeking injunctive relief.  Dkt. No. 1-5.  That same day, Judge Martin Hoffman, after considering the Petition and the requested relief, granted BusPatrol's application for temporary restraining order ("TRO").  Dkt. No. 1-13.  On April 19, 2018, ATS filed a motion to dissolve the TRO.  Dkt. No. 3.  It is important to note that even though ATS had almost a week to do so and had the time to write a 25-page motion, it did not provide any admissible evidence that disputes any facts set forth in BusPatrol's Original Verified Petition; thus, all such facts must be taken as true, and they establish BusPatrol's right to relief.

6156951 v3 (71278.00004.000)

The Court's inquiry is not whether Dallas County Schools was a bad organization filled with bad actors, as ATS goes to great lengths to explain in its filings.[1]  This Court's inquiry is simply whether BusPatrol has presented sufficient facts to support the TRO.   Once the extraneous "noise" is removed from ATS's brief, there are two arguments that ATS asserts in support of its motion to dissolve the Temporary Restraining Order: they are that BusPatrol has not established a likelihood of success on the merits because (1) it has not articulated the trade secrets it contends were misappropriated, (2) it has not established ownership of the trade secrets, and since DCS claims ownership then ATS could not have misappropriated them. Under both state and federal standards, both of these arguments fail and the TRO should not be dissolved for the following reasons:

1.   BusPatrol's Original Petition, the Temporary Restraining Order, and the affidavits attached to this Response all sufficiently identify the trade secrets that BusPatrol contends were misappropriated;

2.   The evidence establishes that BusPatrol purchased the assets at issue from Force Multiplier and affiliated companies, and therefore own the trade secrets in question;

3.   DCS did not have the right to provide BusPatrol's trade secrets to ATS, ATS was informed that DCS did not own the rights to the technology and yet still improperly had two BusStop Technology systems sent to its research facilities for further study, thus misappropriating BusPatrol's trade secrets.

## II.   UNCONTROVERTED FACTS[2]

### A.   BusPatrol's Trade Secrets and their value to BusPatrol's Safety Program.

BusPatrol is the leader in the highly-competitive smart bus technology market.  It has gained this leadership position through the competitive advantage it has as a result of its

---

[1] Those determinations are for Chief Judge Lynn and Judge Godbey.  *See U.S. v. Swartwood*, No. 3:17-cr-00678-M-1 (N.D. Tex. filed Dec. 27, 2017) (Lynn, C.J.); *U.S. v. Sorrells*, No. 3:18-cr-00169-N-1 (N.D. Tex. filed Apr. 2, 2018) (Godbey, J.).

[2] These facts are summarized from the Original Verified Petition and as supplemented by additional affidavits as identified.

confidential and proprietary information, including BusPatrol's trade secrets. BusPatrol's confidential information and trade secrets include proprietary equipment and software that makes up the Busguard System and the ONGO transit system, designs, engineering plans, software structure and architecture, software code, engineering plans, know-how, technical knowledge of what processes work and what does not, lists of components needed to make the system work, processes, maintenance data, procedures, processes and instructions, operating systems, technical or engineering information, designs, plans, compilations, program devices,  programs, methods, techniques, processes, and supplier information (collectively the "Trade Secrets").   *See* Original Verified Petition, Dkt. No. 1-5 at §V(A); *See also*, Declarations of Jean Souliere and Paul M. Stoughton attached as Tabs D ("Souliere Decl.") and E ("Stoughton Decl.").

BusPatrol's Trade Secrets are used as a part of its safety program that helps keep children throughout the United States and Canada safe when riding school buses.  BusPatrol works with cities, school districts, and other governmental entities to deploy proprietary smart bus technology to reduce bus "stop arm" violations[3] through its "Bus Stop Arm Safety Program" ("BusPatrol's Safety Program").  The way BusPatrol's Safety Program works is that, at no cost to a school district, BusPatrol provides cameras both on the inside and outside of a school bus. The inside bus cameras record actions by the bus driver and students at all times.  The outside bus cameras record stop arm violators who pass buses when the stop arm is extended and the red stop lights are flashing.  This video is collected and sent through proprietary software to the cloud where the video is kept on BusPatrol's servers for use by law enforcement and/or the applicable school district.  *See id.*

---

[3] A bus "stop arm" is the extendable stop sign on the side of the bus, which signals to motorists not to pass while the stop arm is extended.

6156951 v3 (71278.00004.000)

Additionally, in the jurisdictions where it does business, BusPatrol provides reporting services and works with the relevant governing entity to send violators a ticket and process payments of such violations. BusPatrol and the relevant governmental entities then share in the revenue collected. This is a two-fold win for school districts because it allows them to increase the level of safety for school children riding buses without any additional cost and also receive revenue for doing so. *See id.*

### B.     BusPatrol owns the BusStop Technology containing its Trade Secrets.

In the summer of 2017, BusPatrol purchased certain confidential and proprietary technology from a group of companies affiliated with Force Multiplier Solutions, Inc. (collectively "FMS").[4] The BusStop Technology forms, in part, BusPatrol's Trade Secrets. BusPatrol's acquisition of ownership of the BusStop Technology and Trade Secrets are discussed below. *See* Souliere Decl. at ¶¶ 2 & 3.

As of February 28, 2014, FMS and Ongo Live, Inc. (an FMS-affiliated entity) ("ONGO") owned all of the BusStop Technology and its related trade secrets. This ownership is demonstrated through two agreements attached hereto. First, on February 28, 2014, FMS entered into an Asset Purchase Agreement between FMS and DCS, in which FMS sold to DCS its right, title, and interest in certain property, but not including the BusStop Technology or its related trade secrets ("FMS-DCS APA"). App'x Tab A, A006-07 (§ 1.2, Assets). Had FMS intended to sell the BusStop Technology to DCS so that DCS could then do whatever it pleased with the BusStop Technology (as ATS incorrectly contends), it would have included this asset as part of the assets sold to DCS rather than specifically excluding it. *Id.* at A013-15 (§ 2.18, Intellectual Property).

---

[4] The term "BusStop Technology" refers to those assets purchased by BusPatrol and including those described as Schedule A to that certain June 14, 2017 letter agreement attached as App'x Tab B at A207-211.

Instead, as a part of the asset sale, FMS and ONGO merely provided DCS a *limited license* to use the BusStop Technology, including its trade secrets in the State of Texas as shown in the Technology License Agreement[5] that was Exhibit E to the FMS-DCS APA.  *See id.* at A051-57.  This is important because the FMS-DCS APA specifically contemplated that the software that ATS now has in its possession would never be allowed to fall into the hands of a third party.  *See id* at A015 (§ 2.18(f), Intellectual Property) ("The transactions contemplated by this Agreement will not result in any third party gaining the right to access the source code included in the Business Owned Intellectual Property in the state of Texas.").

Thereafter, DJSV Technology in Transportation Safety, Inc., a Canadian federal corporation ("DJSV")[6] and BusPatrol acquired the Trade Secrets and BusStop Technology.  *See, e.g.* App'x Tab B at A207-211 (Letter Agreement between FMS, ONGO and DJSV dated June 14 2017); and App'x Tab C at A213-215 (Memorandum of Agreement between DJSV and BusPatrol dated September 15, 2017.   *See also* Souliere Decl. at ¶¶ 3-4. All ownership of the Trade Secrets and BusStop Technology previously owned by FMS and ONGO were transferred to and are presently owned by BusPatrol.  Souliere Decl. at ¶ 4.

### C.     Reasonable steps have been taken to keep its Trade Secrets confidential.

Prior to the transfer of ownership to BusPatrol, the BusStop Technology was protected as a trade secret by requiring the manufacturer of its proprietary products to only manufacture such products and systems for BusPatrol and to enter into a non-disclosure agreement.  Additionally, as products and systems were deployed throughout Texas, the school districts were also required by DCS to sign agreements that contained non-disclosure provisions, and provided for the use of

---

[5] This is the same Technology License Agreement that ATS attached in its Appendix (Dkt No. 5-1) at 50-62.
[6] DJSV is an affiliate of BusPatrol.

such technology only for a very limited purpose.[7]  *See* Interlocal Agreement, attached as in

Defendant's Appendix (Dkt. No. 5-1) at 63-78.  The right to disclose or reverse engineer was not

allowed.  In fact, the FMS-DCS APA specifically prevented any third party from obtaining

access to the proprietary source code.  App'x Tab A at A015; Souliere Decl. at ¶¶5-11.

Similarly, BusPatrol has a robust infrastructure to protect all of its confidential

information, including the Trade Secrets and BusStop Technology, and it took reasonable steps

to protect the secrecy of the Trade Secrets and BusStop Technology.  *Id.* at ¶ 12.  Those efforts

include, at a minimum, the following:

- BusPatrol engages in contracts that required parties to maintain the confidentiality of the Trade Secrets and BusStop Technology, including with customers and suppliers.  Documents given to customers, including proposals, contracts, manuals, and flowcharts related to the Trade Secrets and BusStop Technology, and information exchanged with suppliers so they could build FMS' products incorporating the Trade Secrets and BusStop Technology, are marked "confidential." *Id.* at ¶ 13.

- BusPatrol requires its suppliers to enter into non-disclosure agreements with respect to its Trade Secrets and BusStop Technology, and also requires new hires to execute confidentiality undertakings with respect to the same.  Employees of BusPatrol, are well-informed by the company that the Trade Secrets and BusStop Technology, and that disclosure to unauthorized persons is improper. *Id.* at ¶ 14.

- In terms of security, BusPatrol requires usernames and passwords for all computer server access, including VPN access, where the Trade Secrets and BusStop Technology electronic files are stored.  All electronic systems contain security protection and monitoring, and its physical premises are subject to 24-hour monitoring.  Access to BusPatrol's offices requires a keycard, and certain equipment and products containing Trade Secrets and BusStop Technology is kept under separate lock and key.  BusPatrol subjects its employees to background checks to manage risk related to disclosure of its Trade Secrets and BusStop Technology. *Id.* at ¶ 15.

- Bus Patrol further limits the access to certain highly sensitive portions of the Trade Secrets and BusStop Technology, including related to software

---

[7] DCS's requirement in the Interlocal Agreements that the school districts not disclose, disassemble, modify, or attempt to reverse engineer is a result of the limited rights given to DCS in the Technology License Agreement, and is an incontrovertible recognition that (a) DCS did not own the technology but was merely a sub-licensor, and (b) that the technology and products were to be protected from disclosure to or reproduction by third parties.

development, to certain authorized employees only.   This is done through electronic permissions.  These measures by BusPatrol were reasonable to protect the secrecy of the Trade Secrets and BusStop Technology.

**D.    BusPatrol recently learned that Defendant held a secret meeting with a school district, improperly gained access to        BusPatrol's        proprietary BusGuard kits and had them shipped to its facilities for reverse engineering.**

Defendant ATS is BusPatrol's major competitor in the smart bus technology field. BusPatrol, although being a much smaller company than ATS, has been repeatedly and decisively successful against ATS one-on-one in the market for stop-arm cameras because of BusPatrol's competitive technology advantage. BusPatrol is able to equip and store video and related data from more cameras than ATS' inferior technology.  BusPatrol also provides higher quality video images than Defendant.  Def. App'x at 23.

BusPatrol has recently learned that Defendant—with full knowledge that such information was BusPatrol's trade secrets—met with DCS in Dallas, Texas and improperly obtained access to BusPatrol's proprietary BusStop Technology, and thereafter had two fully-functioning BusGuard kits shipped to ATS's engineering and research lab so that it could attempt to improperly reverse engineer them. *See* Stoughton Decl. ¶ 2-3, 5-10.

Specifically, ATS's representatives secretly met with Scott Peters and other Dallas County Schools representatives and were improperly allowed to view a fully-rigged bus equipped with the technology, cameras, cabling, and onboard computers; the internal components of the onboard computer, which included purpose-built components specially and proprietarily designed for BusPatrol's systems; and the configuration of all of the components that make up the fully-functioning computer and system.  ATS also saw the unit's interface with FMS' back-end solution, which managed the rest of the program's lifecycle, including the processing and review of video evidence, law enforcement approval of the evidence, and the

issuing of tickets and collection of proceeds.   All of these functions run on BusPatrol's proprietary software.   Simply put, ATS got behind the curtain—it improperly saw how BusPatrol's confidential technology, methods, and processes actually work.   *Id.*

Thereafter, ATS had two full units shipped to its research facilities for further analysis by its engineering department.   Both of the units shipped used BusPatrol's proprietary customized operating systems.   These operating systems include customized and proprietary firmware, which allows the onboard computer to interface with the hardware and back-end software. Knowing the secrets of these operating system are particularly important to ATS, because it would allow them to develop an interface that would enable ATS to use BusPatrol's onboard computers and interface it with ATS's backend hardware and software, thus giving ATS access to BusPatrol's multi-camera technology—technology ATS currently does not have.   With possession of the two units, Defendant now had unfettered access to BusPatrol's proprietary technology and back-end solutions at its facilities.   As a result, a sophisticated company like ATS can access, obtain, or otherwise recreate certain source code contained in the software, hardware, and firmware that it improperly obtained from DCS.

Additionally, Mr. Peters instructed others under his supervision, including Paul Stoughton, to answer multiple e-mails from Defendant regarding BusPatrol's proprietary and confidential BusStop Technology.   Specifically such disclosures were made, at a minimum, to Bruce Van Etten, an ATS Infrastructure Architect who was tasked by ATS with reverse engineering the BusStop Technology and Trade Secrets, and Sujeet Karna, who upon information is a software engineer for Defendant.[8]   *Id.*

---

[8] Other ATS employees that also improperly received access to the Trade Secrets include Jeff Hughes and Pat McGrory.

6156951 v3 (71278.00004.000)

After having possession of the physical units and in furtherance of his task to reverse engineer BusPatrol's proprietary technology, Mr. Van Etten asked Mr. Stoughton of DCS a series pointed questions as to how the BusStop Technology worked, what hardware, software, modems, and customizations it used, and how it interfaced with FMS' and BusPatrol's systems. Mr. Stoughton's declaration detailing the types of confidential information requested and improperly obtained by ATS is attached as Appendix Tab E. *See also* Original Petition; Def. App'x at 24.

By the conclusion of this exchange, ATS had all the tools to replicate the BusStop Technology and BusPatrol's Trade Secrets. Its engineers had examined the one fully-assembled system and two disassembled systems in Dallas, and DCS personnel explained in person, at ATS' request and without BusPatrol's consent or acquiescence, how the BusStop Technology worked. Then, ATS requested DCS to send two fully-functioning units sent to its research facilities, after which it asked DCS to reveal the balance of BusPatrol's trade secrets through e-mail exchanges with DCS. ATS kept the units in its research facilities and refused to return them, giving it ample time to reverse engineer and replicate, and use that information to gain an improper competitive advantage over BusPatrol in Texas and everywhere BusPatrol does business – that is, until BusPatrol found out. Stoughton Decl. at ¶¶ 11-13.

### E.   As recently as April 9, 2018, Defendant improperly attempted to convince the manufacturer of BusPatrol's proprietary BusGuard kits to disclose BusPatrol's Trade Secrets.

BusPatrol has also recently learned that on April 9, 2018, Defendant contacted BusPatrol's sole source manufacturer and attempted to convince it to violate its confidentiality obligations to BusPatrol and duplicate BusPatrol's proprietary BusGuard kits for Defendant. All of these activities occurred without BusPatrol's authorization or consent. Def. App'x at 24.

9

F.      **BusPatrol's Application for TRO was properly granted.**[9]

BusPatrol sought injunctive relief on the facts stated above.  Before Judge Hoffman, BusPatrol demonstrated a likelihood of success on the merits of its claims against Defendant. The Court, after considering the application, held that the balance of equities between BusPatrol and ATS favored the issuance of a TRO to preserve the status quo, and that unless ATS was immediately restrained, BusPatrol would be irreparably injured, and suffer loss and damage by:

a)      further loss or disclosure of BusPatrol's trade secret and confidential information;

b)      further loss of goodwill and loss of business reputation;

c)      present and future economic loss, which is unascertainable at this time; and

d)      the destruction of relevant documents and information by Defendant.

Judge Hoffman also found that unless ATS was immediately enjoined, ATS would be able to use BusPatrol's proprietary information against it by using the information it improperly learned to prepare bids against BusPatrol and reverse engineer its technology, thus giving ATS a huge unfair competitive advantage in the DCS bidding and everywhere that ATS competes with BusPatrol.  Judge Hoffman also found that ATS' tortious actions had already caused BusPatrol to lose control over its confidential information and that such harm was imminent because unless injunctive relief was entered immediately, ATS would in all likelihood continue its tortious conduct to BusPatrol's detriment.  These circumstances have not changed, and the TRO remains proper under the federal standards, as it was under Texas law.

### III.   ARGUMENT AND AUTHORITIES

A.      **Basic Legal Standards.**

"To obtain a temporary restraining order, an applicant must show entitlement to a preliminary injunction."  *Horner v. Am. Airlines, Inc.*, No. 3:17-CV-0665-D, 2017 WL 978100,

---

[9] *See* TRO attached at Dkt. No. 1-6 (Ex. A).

6156951 v3 (71278.00004.000)

at *1 (N.D. Tex. Mar. 13, 2017) (Fitzwater, J.); *Hassani v. Napolitano*, No. 3:09-CV-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (Fitzwater, C.J.) (both noting a TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief").  In turn, to obtain a preliminary injunction, the movant must establish that: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm to him if the TRO is not granted, (3) that the threatened harm outweighs any damage that the TRO might cause the opposing parties, and (4) that the TRO will not disserve the public interest.  *Id.*; *see also Tex. Midstream Gas Servs., LLC. v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).  The party seeking relief bears the burden of persuasion on all four requirements.  *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

### B.    ATS conflates the standards for pleading and the issuance of a TRO.

#### 1.    The pleadings requirements of Rule 8 are irrelevant to a TRO.

Importantly, ATS does not argue that the Dallas District Court did not have sufficient evidence to enter the TRO.  ATS argues only that the propriety of the TRO must now be governed by federal standards, and because BusPatrol has allegedly not stated its trade secrets with sufficient specificity in its complaint, the TRO must be dissolved.

ATS confuses the Rules of pleading under Rule 8 with evidentiary standards pertaining to TROs.  A TRO may be based upon evidence outside the pleadings.  Rule 65 (b)(1)(a) allows the TRO to be granted based upon an "affidavit" as well as a verified complaint.  Fed. R. Civ. P. 65(b)(1).  The Rule itself therefore contemplates evidence outside the pleadings, which can cure any alleged lack of specificity in the complaint.

6156951 v3 (71278.00004.000)

As set forth below, a motion to dissolve a TRO is a proceeding independent of the pleadings, and the Court is entitled to (1) consider evidence outside the pleadings and (2) consider evidence not offered at the hearing on the *ex parte* TRO. Whether BusPatrol has satisfied Rule 8 pleading requirements therefore has nothing to do with this motion, because this Court's analysis is not dependent upon the specificity of the Complaint.

If ATS wants to argue that BusPatrol's complaint lacks sufficient specificity, then that must be left to a Rule 12 motion, which ATS has not yet filed. That is particularly the case where, as here, BusPatrol filed its petition in state Court in accordance state Court rules, and BusPatrol has a right to amend its complaint to meet any objections that ATS may have to the form and content of the complaint and to conform the complaint to Federal court pleading requirements. *See* Fed. R. Civ. P. 15(a)(1)(b).

The linchpin of ATS's argument is that "plaintiff's state court petition fails to plead and prove that plaintiff is entitled to a temporary restraining order under Federal Rule of Civil Procedure 65" and that "if such vague and conclusory allegations are insufficient to maintain an action in federal court, surely they must fail to sustain the extraordinary relief of a temporary restraining order." (Dkt. No. 4 at 10 and 17). The Court should note neither of these statements is supported by citation to authority. There is no authority that the grant or denial of a motion to dissolve a TRO pursuant to Rule 65(b)(4) hinges upon whether a plaintiff has satisfied pleading requirements of Rule 8.

ATS also relies upon two lines of cases, neither of which apply here. The first line of cases is exemplified by *Pension Advisory Group, LTD v. Country Life Insurance Company*, 771 F. Supp. 2d 680 (S.D. Tex. 2011) and *Clearline Techs. LTD v. Cooper B-Line, Inc.*, 2012 WL 43,366 (S.D. Tex. Jan. 9, 2012). Each of those cases involves situations where the plaintiff

6156951 v3 (71278.00004.000)

failed to identify in a complaint the specific trade secrets that had been misappropriated (which BusPatrol has done; *see* infra), and as such they were required to re-plead under Rule 12. The Court can therefore ignore that line of cases because it has nothing to do with this motion.

The other line of cases relied upon by ATS is exemplified by *StoneEagle Services, Inc. v. Valentine*, 2013 WL 9554563 (N.D. Tex. June 5, 2013). That line of cases stands for the proposition that a court has authority pursuant to Rule 16 to require the plaintiff to specifically identify trade secrets in order to enable the court to properly tailor discovery as to the specific issues involved in misappropriation of those trade secrets. That line of cases also has nothing to do with whether the underlying TRO was appropriate.

The real issue is what evidence the Court may consider on a motion dissolve a TRO pursuant to Rule 65(b)(4). If the Court were confined to consider only the pleadings, then ATS's argument that the pleading is insufficient to support the TRO might have some merit. But that is not the case.

On a motion to dissolve a TRO pursuant to rule 65(b)(4), the Court may consider evidence beyond the complaint and also evidence in addition to that offered at the hearing on the *ex parte* TRO. Wright & Miller, *Federal Practice and Procedure*, indicates that additional evidence may be offered on the motion to dissolve, because in some circumstances, if the record is sufficiently developed, the Rule 65(b)(4) hearing may actually serve as a preliminary injunction hearing under Rule 65(a). "In some situations, the parties may find that they are prepared to offer sufficient evidence at a hearing to modify or dissolve the temporary restraining order so that, in effect, the proceeding becomes a hearing on a preliminary injunction." IIA C. Wright & A. Miller, *Federal Practice and Procedure*, §2953 (2013) (citing *Granny Goose Foods, Inc. v. The Brotherhood of Teamsters and Auto Truck Drivers, Local Number 70 of*

*Alameda County*, 415 U. S. 423, 441 (1974)).  As reasoned by the Supreme Court in *Granny Goose Foods*:

> [O]nce a case has been removed to federal court, its course is to be governed by federal law, including the Federal Rules of Civil Procedure. Rule 65(b) establishes a procedure whereby the party against whom a temporary restraining order has issued can move to dissolve or modify the injunction, upon short notice to the party who obtained the order.  Situations may arise where the parties, at the time of the hearing on the motion to dissolve the restraining order, find themselves in a position to present their evidence and legal arguments for or against a preliminary injunction.  In such circumstances, of course, the court can proceed with the hearing as if it were a hearing on an application for a preliminary injunction.   At such hearing, as in any other hearing in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying preliminary injunctive relief, such as the likelihood of irreparable injury to it if an injunction is denied and its likelihood of success on the merits.
>
> On the other hand, situations might arise where the parties are not prepared and do not intend at the hearing on the motion to dissolve or modify the temporary restraining order to present their cases for or against a preliminary injunction. In such circumstances, the appropriate procedure would be for the district court to deal with the issues raised in the motion to dissolve or modify the restraining order, but to postpone for a later hearing, still within the time limitations of Rule 65(b), the application for a preliminary injunction.

*Granny Goose Foods*, 415 U.S. at 441. While the *Granny Goose* Court was addressing whether the refusal to dissolve a TRO was a *de facto* preliminary injunction, the statements of the court necessarily indicate that on a motion to dissolve, this Court is permitted to consider evidence in addition to that offered at the initial *ex parte* TRO hearing.

Although BusPatrol is not suggesting that the record is sufficiently developed for a preliminary injunction hearing, the above-cited authorities indicate that a motion to dissolve is a proceeding that is not based solely on the pleadings.  The Court may consider evidence beyond the pleadings.  The Court may also consider additional evidence that was not part of the record when the TRO was initially granted.  ATS has in fact admitted this, in that it has offered an appendix of exhibits in support of its motion to dissolve the TRO.

If the Court's evaluation of the propriety of the TRO can take into account evidence that was not previously considered when the initial TRO was granted, and the Court can also consider evidence that is not part of the complaint, then ATS's argument that the complaint itself does not state the alleged trade secrets with sufficient specificity is not relevant to this motion.   To the extent that BusPatrol must offer a specific statement as to its trade secrets, it can and has done so in the Affidavit of Jean Souliere.  App'x Tab D.

### 2.        **BusPatrol has adequately pleaded its trade secrets.**

Even if the pleading requirements of Rule 8 have any application to evidentiary standards regarding a motion to dissolve a TRO, BusPatrol has satisfied those pleading requirements.  The cases relied upon by ATS are inapposite.  In each of those cases, (*Pension Advisory Group, LTD v. Country Life Insurance Company*, 771 F. Supp. 2d 680 (S.D. Tex. 2011), *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 2012 WL 43,366 (S.D. Tex. Jan. 9, 2012) and *Medafor, Inc. v. Starch Med Inc.*, 2009 WL 2163580 (D. Minn. July 16, 2009)), the plaintiff alleged in a vacuum that the defendant had stolen trade secrets, without making any attempt to identify those trade secrets.[10] In each case, the allegations were insufficient for the defendant to determine the trade secrets it had supposedly misappropriated. In contrast, if the plaintiff identifies the specific subject matter of the trade secret such that the "defendants are able to determine whether the information in question was in fact secret and whether it was in fact not readily ascertainable by independent means" such pleading is sufficient. *Vesta Corp. v. Amdocs Management Ltd.*, 80 F. Supp. 2d 1152, 1164 (D. Or. 2015).

---

[10] It should also be noted that in each case the plaintiff was permitted to replead its claims, and therefore any pleading defect was not fatal

Here, while ATS cites to portions of the state court petition which set forth a list of trade secrets involved, ATS completely ignores that the petition makes patently clear that the issue is the appropriation of BusPatrol's proprietary onboard computer and camera technology.  This technology includes the configuration, design, interface, communication methods, software, hardware, firmware and source code utilized by BusPatrol's technology, all of which ATS obtained by virtue of getting the information and devices from DCS.  BusPatrol has set forth in detail that it is the owner of that unique technology related to the bus camera system, that it developed that technology, and that the technology is proprietary and has been kept secret.  BusPatrol has also pleaded at great length that ATS improperly obtained BusPatrol's proprietary bus camera units and computer information from DCS.

These allegations are more than sufficient to place ATS on notice of the trade secrets involved.  Moreover, the uncontroverted evidence was that ATS and was told that DCS did not own the technology, only that it was a licensee.  At a minimum, this would have put a sophisticated company such as ATS on notice that there was an issue regarding the information it was receiving.  Additionally as set forth in the declaration of former DCS employee Paul Stoughton, DCS was giving ATS access to BusPatrol's Trade Secrets specifically so that ATS would gain an improper advantage and win the bid to purchase any assets of the Bus Stop Arm Program.  There can be little doubt of ATS's improper motive in obtaining BusPatrol's Trade Secret technology.

**C.      BusPatrol satisfied the four elements required for a preliminary injunction.**

**1.      <u>Likelihood of Success on the Merits.</u>**

As Defendant points out, to establish the first element of likelihood of success on the merits, a movant "must present a prima facie case but need not show that he is certain to win."

6156951 v3 (71278.00004.000)

*Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (citation omitted). "A prima facie case does not mean [the movants] must prove they are entitled to summary judgment." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 684-85 (N.D. Tex. 2016) (citing *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)).  Instead, a prima facie case is defined as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Prima Facie Case*, BLACK'S LAW DICTIONARY (10th ed. 2014).  Here, BusPatrol has filed a cause of action against ATS for trade secret misappropriation under the Texas Uniform Trade Secrets Act ("TUTSA"), which expressly authorizes injunctive relief for actual or threatened misappropriation.  Tex. Civ. Prac. & Rem. Code § 134A.003.

### a)      BusPatrol Owns Trade Secrets in the BusStop Technology

As set forth in the Original Petition and Mr. Souliere's Declaration, the evidence shows that BusPatrol owns the BusStop Technology and the information that it claims is its resulting trade secrets. *See* Souliere Decl.¶¶ 2-4.  The fact that DCS had a limited license to use the BusStop Technology for a particular purpose (and which did not allow the disclosure of trade secrets to ATS) is consistent with BusPatrol's ownership claim.

Under TUTSA, a trade secret is any information that (A) Plaintiff has taken reasonable efforts to keep secret and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  *Id.* at §134A.002(6)(A)-(B).

Here, the types of Bus Patrol's trade secrets at issue include the proprietary equipment and software that makes up the Busguard System and the ONGO transit system, designs, engineering plans, software structure and architecture, software code, know-how, technical

knowledge of what processes work and what does not, lists of components needed to make the system work, processes, maintenance data, procedures, processes and instructions, operating systems, technical information, designs, plans, compilations, program devices,  programs, methods, techniques, processes, and supplier information.  Def. App'x at 21; Souliere Decl. at ¶ 2; Stoughton Decl. at ¶ 8-12.  These are the types of information that may be protectable as trade secrets by statute and under common law. *Id.* at §134A.002(6);   *See also, T-N-T Motorsports*, 965 S.W.2d at 22, 25.

If reasonable means to keep the trade secrets secret were taken, absolute secrecy is not required to establish a trade secret, as long as the alleged trade secret is not generally known or readily available through independent investigation.  *See H.E. Butt Groc. Co. v. Moody's Qual. Meats*, 951 S.W.2d 33, 35 (Tex. App.—Corpus Christi 1997, writ denied); *see Metallurgical Industries, Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986); *Lamont  v. Vaquillas Energy Lopeno, Ltd.*, 421 S.W.3d 198, 212 (Tex. App.—San Antonio 2013, no pet.). The requirement of secrecy is satisfied if it would be difficult or costly for others who could exploit the information to acquire it without resorting to the wrongful conduct. *See* Restatement (Third) of Unfair Competition § 39, cmt. f.

In this case, BusPatrol has brought forth evidence that reasonable means were used to keep BusPatrol's trade secrets secret.  *See* Souliere Decl. at ¶¶ 5-15; *See also* Stoughton Decl. at ¶ 3.   Bus Patrol has also brought forth sufficient evidence that the trade secrets are valuable from not being known and are not readily ascertainable through proper means, including the fact that it has spent over $7 million in purchasing and developing them.  *See* Souliere Decl. at ¶¶ 16-21; *See also* Stoughton Decl. at ¶ 8-9.    Accordingly, BusPatrol's different types of information should be considered Trade Secrets.

### (b)    ATS obtained BusPatrol's Trade Secrets through Improper Means

BusPatrol's Trade Secrets in this case were acquired by "improper means" which is defined in TUTSA to include actions such as (1) misrepresentation, or (2) inducement of a breach of a duty to maintain secrecy, or to prohibit discovery of a trade secret  *Id.* at 134A.002(2).  Likewise, the "improper means" requirement is also derived from the Restatement of Torts § 757, developed under common law, and ultimately incorporated into TUTSA. "Improper means" are "[m]eans which fall below the general accepted standards of commercial morality and reasonable conduct."  Restatement of Torts §757, cmt. f (1939); *E.I. DuPont de Nemours & Co. v. Christopher*, 431 F.2d 1012, 1016-17 (5th Cir. 1970) (applying Texas law), *cert. denied*, 400 U.S. 1024 (1971) (flying airplane over plant discover trade secret is improper).

The mere fact that knowledge of the information might be acquired through lawful means *is irrelevant* if the information is shown to have been acquired through use of improper means. "In Texas, courts condemn the employment of improper means to procure trade secrets.  The question is not, 'How could he have secured the knowledge?' but 'How did he?'" *Tendeka, Inc. v. Glover*, No. H-13-1764, 2015 WL 2212601, at *14 (S.D. Tex. May 11, 2015) (applying Texas law) (quoting *American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ)); *see also Fetter v. Associated Rack Corp.*, 607 S.W.2d 272, 275-76 (Tex. Civ. App.—Texarkana 1980, writ ref d. n.r.e.) cert. denied, 454 U.S. 965 (1981) (the fact that information may be available on the open market does not preclude recovery if defendant did not take the time to research and inspect the information on the open market).[11]

The evidence shows that ATS obtained access to BusPatrol's Technology through improper means.  First, ATS and DCS secretly met, where ATS obtained complete review of

---

[11] A defendant has no right to reverse engineer a product if it was not acquired through lawful means or from a person who had a legal right to convey the right to reverse engineer the product. Tex. Civ. Prac. & Rem. Code §134A.002(4).

6156951 v3 (71278.00004.000)

BusPatrol's Busguard system. *See* Stoughton Decl. at ¶ 2-3, 5-10. Second, ATS was told by DCS that DCS did not own the BusStop Technology. *Id.* at ¶ 11.   Third, DCS did not have the authority to disclose BusPatrol's BusStop Technology or Trade Secrets because it would allow in the potential access of BusPatrol's confidential information and source code. *See* App'x Tab A at A015.  Fourth, even after learning that DCS did not own the technology, ATS continued to ask numerous specific questions seeking confidential information about BusPatrol's BusStop Technology and Trade Secrets, and then requested that two complete systems be shipped to their research facilities. *See* Stoughton Decl. at ¶¶ 11-14.  Finally, these improper disclosures were part of a plan to make sure that ATS had a competitive advantage over BusPatrol and any other bidder when bidding for certain alleged assets owned by DCS.  *Id.* at 14.

Coupled with the extensive facts cited by BusPatrol in the sections above, Plaintiff has proven a likelihood of success on several alternative paths to TUTSA liability:

> a)   ATS misappropriated BusPatrol's Trade Secrets when it acquired BusPatrol's Trade Secrets when it knew or had reason to know that BusPatrol's Trade Secrets were acquired by improper means (*see* Tex. Civ. Prac. & Rem. Code at § 134A.002(3)(A));

> b)   ATS disclosed or used[12] BusPatrol's Trade Secrets without BusPatrol's express or implied consent when it used improper means to acquire knowledge of BusPatrol's Trade Secrets (*see Id.* at § 134A.002(3)(B)(i));

> c)   ATS disclosed or used BusPatrol's Trade Secrets without express or implied consent when it knew or had reason to know that ATS' knowledge of the trade secret was… acquired under circumstances giving rise to a

---

[12]   *See Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 600 (5th Cir. 2015) ("use" includes relying on the trade secret to assist or accelerate research or development); *See also, Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013)(as a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use')  *see also* Restatement (Third) of Unfair Competition § 40 cmt. c.

duty to maintain its secrecy or limit its use (*Id.* at § 134A.002(3)(B)(ii)(b));

d)   ATS used or disclosed BusPatrol's Trade Secrets without express or implied consent when it knew or had reason to know that ATS' knowledge of the trade secret was … derived from or through a person (DCS) who owed a duty to BusPatrol to maintain its secrecy or limit its use (*Id.* at § 134A.002(3)(B)(ii)(c)); or

e)   ATS used or disclosed BusPatrol's Trade Secrets without express or implied consent by a person who… before a material change of ATS' position, knew or had reason to know that BusPatrol's Trade Secrets were, in fact, trade secrets, and that knowledge of them had been acquired by accident or mistake (*Id.* at § 134A.002(3)(B)(ii)(c)).

Based on the foregoing, BusPatrol has satisfied its requirement that it has proven a likelihood of success on the merits of its trade secret misappropriation claim.

## 2. <u>Irreparable Harm.</u>

Under TUTSA "actual or threatened misappropriation [of a trade secret] may be enjoined". *Id.* at §134A.003(a).  "To show irreparable harm for misappropriation of trade secrets under Texas law, a movant need show only that 'the defendant possesses the trade secrets and is in a position to use them.' *First Command Fin. Planning, Inc. v. Velez*, 4:16-CV-01008-O, 2017 WL 2999405, at *6 (N.D. Tex. May 8, 2017) (applying TUTSA and granting injunction) (quoting *Hughes v. Age Indus., Ltd.*, No. 04–16–00693–CV, 2017 WL 943423, at *5 (Tex. App.—San Antonio Mar. 8, 2017, no pet.)).

 "Because the very purpose of an injunction is to prevent disclosure of trade secrets pending trial, **an applicant is not required to show the defendant is actually using the information**," only that defendant is in a position to use them.  *Hughes*, 2017 WL 943423, at *5. Injunctive relief is appropriate to prevent the disclosure of confidential information which was maintained as a trade secret. *Picker Int'l, Inc. v. Blanton*, 756 F.Supp. 971, 980 (N.D. Tex.

1990).  The fact that a single trade secret may be disclosed is enough for injunctive relief.  *Picker Intl*, 756 F.Supp. at 983.

ATS admits in its introduction to its Motion to Dissolve that it has possession of BusPatrol's trade secret information, and ATS is now in a position to use information learned from that possession.  Accordingly, BusPatrol has established the element of irreparable harm.

### 3. Threatened Harm Outweighs Any Damage Injunctive Relief Might Cause ATS.

ATS does not contest that the threatened harm of disclosure of BusPatrol's Trade Secrets and BusStop Technology outweighs any damage the injunctive relief might cause ATS.   This element requires only that BusPatrol "show that, absent an injunction, its threatened injury outweighs any harm [ATS] will suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss*., 697 F.3d 279, 297 (5th Cir. 2012).  Where irreparable harm is shown, the party opposing injunctive relief "would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." *Id.*  Here, BusPatrol's threatened injury is the loss of its trade secrets and the economic value that flows from them; ATS has presented no evidence to refute this, nor any evidence of its own harm for the limited duration of the TRO.   Accordingly, BusPatrol has met its burden as to this injunction prerequisite.

### 4. The TRO Will Not Disserve the Public Interest.

ATS in its Motion does not even attempt to complain that this requirement was not met, likley because Texas public policy has long held that that "[t]he protection of a trade secret is a well-recognized objective of equity."  *K&G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv*., 314 S.W.2d 782, 790 (1958), *on reh'g sub nom. K & G Oil Tool & Serv. Co., Inc. v. G & G*

*Fishing Tool Serv.*, No. A-6577, 1958 WL 91271 (Tex. June 4, 1958).  The Dallas Court of

Appeals, quoting the Texas Supreme Court in *K&G Oil Tool*, recently said:

> A defendant should not be allowed to gain information through a breach of confidence and "escape the efforts of inspection and analysis' necessary to produce a duplicate product…"
>
> "[t]he mere fact that the means by which a discovery is made are obvious ... cannot ... advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer"

*Halliburton Energy Services, Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 258–59 (Tex. App.—

Dallas 2014, no pet.) (*citing K&G Oil Tool*, 314 S.W.2d at 788).  The Fifth Circuit Court of

Appeals, applying Texas common law for misappropriation of trade secrets, has similarly said:

> [T]he cost of devising the secret and the value the secret provides are criteria in the legal formulation of a trade secret shows the equitable underpinnings of this area of the law.  It seems only fair that one should be able to keep and enjoy the fruits of his labor.  If a businessman has worked hard, has used his imagination, and has taken bold steps to gain an advantage over his competitors, he should be able to profit from his efforts.  Because a commercial advantage can vanish once the competition learns of it, the law should protect the businessman's efforts to keep his achievements secret….
>
> [T]his is an area of law in which simple fairness still plays a large role.

*Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1201 (5th Cir. 1986).  Because the

Texas Supreme Court and Fifth Circuit Court of Appeals both recognize it is sound public policy

to protect trade secrets, BusPatrol's trade secrets should be protected here.  BusPatrol has

satisfied the final element for preliminary injunctive relief.

### D.      The Court should not consider ATS Appendix Exhibit "D"

With no supporting sworn evidence, ATS argues that BusPatrol's ownership of the

cameras that were improperly supplied to ATS is "questionable" because the Dissolution

Committee claims that it owns the cameras.  In support of this proposition, ATS has included in

its appendix several letters purported to be authored by Alan King, who is CEO of the Dissolution Committee.

The Court should not consider these letters.  First, ATS has made no attempt whatsoever to authenticate these letters, and they are therefore not properly before the court.  Fed R. Evid. 901(a)(b)(1) (authentication requires testimony from a witness "that an item is what it is claimed to be.").  But more importantly, ATS is offering the statements in the letters for their truth.  The only purpose of the letters is as supposed evidence that the Dissolution Committee owns the cameras.  The statements in those letters are therefore hearsay, because they are an out of court statement offered for its truth.  Fed. R. Evid. 901(c); *see Cantor v. Wachovia Mortgage, FSB*, 641 F. Supp. 2d 602, 609 ( N.D. Tex. 2009) (statement in an e-mail that  a defendant was a citizen of California was hearsay when offered for the proof of that fact).  Moreover, no hearsay exception applies.  The Court should therefore not consider these letters, and should strike them from the evidence.

Equally important, even if the letters had been offered in admissible form, they are of absolutely no probative value whatsoever.  Alan King cannot unilaterally declare who owns these cameras.  Ownership of the cameras, and more importantly the technology in the cameras, is a legal conclusion.  The Court should also note that there is no basis stated in those letters for Mr. King's declaration of ownership. It is merely what Mr. King thinks.  The statement is also by its very nature self-serving given that Mr. King is declaring the Dissolution Committee's ownership.  The Court should give no weight to this statement.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff BusPatrol respectfully requests the Court deny Defendant's Motion to Dissolve Temporary Restraining Order, and award such other and further relief as it may be justly entitled.

   6156951 v3 (71278.00004.000)